No. 2--05--0393          Filed 5/3/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No.  04--CF--365 |
| ARIC SVEN, | ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE GROMETER delivered the opinion of the court:

Defendant, Aric Sven, was convicted of one count of child pornography (720 ILCS 5/11--20.1 (West 2002)) following a bench trial in the circuit court of Lake County.  Prior to trial, defendant pleaded guilty to four counts of unlawful videotaping (720 ILCS 5/26--4 (West 2002)).  He raises no issue as to these counts on appeal.  He does, however, contest his conviction of child pornography, arguing that the tapes he produced do not fall within the statutory definition of child pornography.  We disagree and therefore affirm.  We also reject defendant's contention that his sentence of eight years' imprisonment is excessive.

Defendant produced a number of videotapes, which were recovered from his home with the consent of his wife, by virtue of placing hidden video cameras in his bathroom.  Two cameras were operating, one aimed at waist level and the other pointing down from a higher angle.  The latter was

hidden in the speaker of a television set that was mounted in the corner of the bathroom. The cameras did not zoom in or out, nor did they pan from side to side.

At issue here is a tape defendant recorded of his daughter's babysitter. At the time of the taping, defendant's daughter was still an infant. The babysitter was 14 or 15 years old. When defendant arranged for the babysitter to care for his daughter, he instructed her to give the baby a bath. Defendant instructed the babysitter to get into the tub with the baby, purportedly for safety reasons. The babysitter testified that she was unaware that she was being taped.

The tape shows the babysitter dressing and undressing in the bathroom. Throughout much of the video, she is nude. The babysitter is seen bathing with the baby, holding the baby, bouncing the baby in her arms, and, at one point, dancing with the baby to keep her from crying. As the trial court noted, there were two occasions where the babysitter touched her own genital area. However, as the trial court also correctly noted, this was the sort of innocent conduct in which people engage in the bathroom. The sole issue before us is whether these images constitute child pornography. We hold that they do.

The crime of child pornography is defined by section 11--20.1 of the Criminal Code of 1961 (Code) (720 ILCS 5/11--20.1 (West 2002)), in pertinent part, as follows:

> "(a) A person commits the offense of child pornography who:
>
>> (1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction *** any child whom he knows or reasonably should know to be under the age of 18 ***:
>>
>> * * *

(vii) depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed genitals, pubic area, buttocks, or, if such person is female, a fully or partially developed breast of the child ***."

Defendant contends that the videotape he made does not constitute child pornography because the images are not lewd, as required by the statute. He argues that the tape simply depicts ordinary activity in which people engage while in the bathroom.

Defining "lewd" has proven somewhat problematic for courts. In People v. Walcher, 162 Ill. App. 3d 455, 460 (1987), the court, quoting Black's Law Dictionary, defined "lewd" as " '[o]bscene, lustful, indecent, lascivious, lecherous.' " Walcher, 162 Ill. App. 3d at 460, quoting Black's Law Dictionary 817 (5th ed. 1981). These terms, while synonymous, provide little concrete guidance. Relying on definitions like these would leave courts with an I-know-it-when-I-see-it approach, reminiscent of the United States Supreme Court's attempts to define obscenity. See Jacobellis v. Ohio, 378 U.S. 184, 197, 12 L. Ed. 2d 793, 803-04, 84 S. Ct. 1676, 1683 (1964) (Stewart, J., concurring). Such an approach is constitutionally infirm. It is true that child pornography enjoys no protection under the first amendment. New York v. Ferber, 458 U.S. 747, 764, 73 L. Ed. 2d 1113, 1127, 102 S. Ct. 3348, 3358 (1982). A definitional problem, however, does exist. In order for a court to determine whether an image is not protected, the court must first determine whether the content of the image fits within the boundaries of child pornography. As the Supreme Court phrased it in Ferber, "The category of [depicted] 'sexual conduct' proscribed must also be suitably limited and described." Ferber, 458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct at 3358.

Strictly speaking, we are not confronted with a constitutional issue; rather, the issue before us is whether the images defendant produced are lewd within the meaning of Illinois's child

pornography statue (720 ILCS 5/11--20.1 (West 2002)).  However, as the Illinois Supreme Court recognized, the child pornography statute finds its genesis in the standards set forth in Ferber:

"In accordance with the standards set forth in *Ferber, a person commits the offense of child pornography in Illinois by photographing or possessing photographs of any child whom the person knows or reasonably should know to be under the age of 18 where such child is depicted or portrayed in any pose, posture or setting involving a lewd exhibition* of the unclothed genitals, pubic area, buttocks, or, if such person is female, a fully or partially developed breast of the child or other person.' "  (Emphasis in original.)  People v. Lamborn, 185 Ill. 2d 585, 590 (1999), quoting 720 ILCS 5/11--20.1(a)(1)(vii), (a)(6) (West 1996).

Thus, in determining whether an image is lewd for the purpose of the child pornography statute, a court also necessarily is determining whether the image is not protected by the first amendment. Constitutional proscriptions, such as Ferber's requirement that the conduct proscribed is sufficiently defined (Ferber, 458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct at 3358), do apply.  Accordingly, a workable definition of "lewd" is required.

In United States v. Dost, 636 F. Supp. 828 (S.D. Cal. 1986), the United States District Court for the Southern District of California articulated a number of factors that have been widely adopted by courts assessing whether an image of a child is lewd or lascivious.  See Lamborn, 185 Ill. 2d at 592 (collecting cases).  The standard has been adopted and applied in this state.  Lamborn, 185 Ill. 2d at 592; People v. Lewis, 305 Ill. App. 3d 665, 678 (1999).  In making such determinations, the following factors are relevant:

"(1) whether the focal point of the visual depiction is on the child's genitals; (2) whether the setting of the visual depiction is sexually suggestive, *i.e., in a place or pose generally associated with sexual activity   3   whether the child is depicted in an unnatural*

*pose,* or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." Lamborn, 185 Ill. 2d at 592.

Not all factors need be present for an image to be deemed lewd. Lamborn, 185 Ill. 2d at 592. Instead, the image must be judged in light of its overall content, while taking into account the age of the minor. Lamborn, 185 Ill. 2d at 592-93. Since the overall content is relevant, the Dost factors are not all inclusive. Finally, simple nudity, while a factor to consider under Dost, is not sufficient in itself to render an image lewd. The Illinois legislature proscribed a "lewd exhibition of the unclothed genitals." 720 ILCS 5/ 11--20.1(a)(1)(vii) (West 2002). Equating nudity with lewdness would render the term "unclothed" meaningless, which contravenes a basic principle of statutory construction. People v. Maggette, 195 Ill. 2d 336, 350 (2001) ("A court should *construe a statute, if possible, so that no term is rendered superfluous or* meaningless").

It must be emphasized that we are assessing the content of the images rather than the conduct of defendant. As our supreme court stated, "We must review the photographs themselves and determine whether those photographs are lewd under the child pornography statute." Lamborn, 185 Ill. 2d at 590. Later, in discussing the sixth prong of the Dost test, the court emphasized that "[a] determination that a photograph constitutes child pornography focuses on the photograph itself." Lamborn, 185 Ill. 2d at 594. Our inquiry, then, is clearly limited to the content of the videotape itself. As defendant points out in his brief, the manner of its making and other facts external to the images, though unsavory, are irrelevant for the purpose of determining whether the images are lewd. In fact, defendant's conduct surrounding the making of the tape constitutes the separate crime of unlawful videotaping (720 ILCS 5/26--4 (West 2004)).

Finally, in determining whether an image is "lewd" within the meaning of the child-pornography statute, the de novo standard of review applies. Lamborn, 185 Ill. 2d at 590. This standard has been criticized. See Lamborn, 185 Ill. 2d at 598 (Heiple, J., dissenting); Lewis, 305 Ill. App. 3d at 677. Given that the analysis focuses on the content of the images, de novo review makes sense. Quite simply, the trial court is in no better position to judge the content of a photographic image than we are where the image is available to us. Indeed, the principle that we conduct de novo review where facts are undisputed and only questions of law remain is a common one. See, e.g., City of Champaign v. Torres, 214 Ill. 2d 234, 241 (2005) ("The pertinent facts are uncontroverted. The task before us is to determine how the relevant statutory terms and constitutional principles should apply to those uncontroverted facts. Where, as here, the question on appeal is limited to application of the law to *undisputed facts, the standard of review is de novo* People v. Kleutgen, 359 Ill. App. 3d 275, 278 (2005) (DUI case); People v. Dieppa, 357 Ill. App. 3d 847, 849 (2005) (validity of search); Farris v. Industrial Comm'n, 357 Ill. App. 3d 525, 527 (2005) (wage determination under Worker's Compensation Act). Here, not only are the facts undisputed, but we are able to observe the alleged crime, that is, the images, firsthand. There is no reason to defer to the trial court's determination on this matter.

With these standards in mind, we now turn to the images at issue in this case. The first factor we must consider is "whether the focal point of the visual depiction is on the child's genitals." Lamborn, 185 Ill. 2d at 592. Defendant concedes that there are times where all that is seen is the babysitter's genitals. However, he points out that at other times, her entire body is visible and at still others, nothing is visible save the bathroom itself. Defendant's argument requires us to consider a preliminary question: are we to consider the tape as a whole or is it proper to focus upon particular images such that one portion of the tape may be lewd while another may not? We believe the latter

approach is correct. Ferber provides sound guidance on this point. In that case, the Supreme Court made the following observation: "[A] *work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. It is irrelevant to the child who has been abused whether or not the material has a literary, artistic, political or social value.* [Citation]." Ferber, 458 U.S. at 761, 73 L. Ed. 2d at 1125, 102 S. Ct. at 3356-57. In the present case, it is similarly irrelevant that portions of the tape show nothing but the bathroom itself. The presence of such passages on the tape does not serve to dilute other portions where the babysitter appears naked. We conclude, therefore, that it is proper to consider portions of the tape individually and determine whether they, in themselves, are lewd.

Having rejected defendant's premise that the videotape should be judged in its entirety, his concession that "there are times that all that is seen on the videotapes are the minor's vagina or buttocks" becomes dispositive. Since there are times in which "the focal point of the visual depiction is on the child's genitals" (Lamborn, 185 Ill. 2d at 592), this factor weighs in favor of finding that the images are lewd.

The next factor is "whether the setting of the visual depiction is sexually suggestive, *i.e., in a place or pose generally associated with sexual activity.*" Lamborn, 185 Ill. 2d at 592. It is, perhaps, debatable whether a bathroom is a place "generally associated with sexual activity." However, Lewis teaches that a more substantial inquiry is necessary. In Lewis, this court observed the following: "Regarding factor two, although the setting is a bedroom, this fact is not used to suggest sexual activity. A made-up bed appears in the background without any indication that the bed has any sexual meaning in the photo." Lewis, 305 Ill. App. 3d at 678.

A bedroom is certainly more closely associated with sexual activity than a bathroom, yet even regarding a bedroom, the Lewis court considered the overall tone of the image. Applying the same analysis in this case, there is nothing sexually suggestive about the setting of the tape. While a bathroom may be associated with sexual activity in some circumstances, in this case, where the victim was bathing an infant, the "setting" is not sexually suggestive. Indeed, the State does not seriously contest this prong.

Third, we must determine "*whether the child is depicted in an unnatural pose,* or in inappropriate attire, considering the age of the child." Lamborn, 185 Ill. 2d at 592. Defendant asserts that there is nothing unnatural about the activities that take place in the videotape. Considering the images in themselves, according to defendant, the activity depicted could simply be a young mother bathing with her infant. The State's response goes seriously awry at this point. The State argues that assuming that there was a familial relationship between the infant and the person bathing her, and further assuming that a mother would bathe with her infant, the images at issue "are not the spontaneous type of photograph taken by parents of their young child bathing." Instead, the State continues, "they are the premeditated, secretive videotapes of a fully-developed, completely naked, 14 or 15 year old neighbor who had been duped by defendant into bathing with his daughter." Indeed, the State concludes that this is so because the images "involve[] a naked minor not related to the baby." The State's argument is ill-taken in that it relies on how the tape was made (which, as noted previously, constitutes a different crime) and other information extraneous to the images themselves. That the person holding the infant had been duped cannot be known from the images themselves, nor can the fact that she was a neighbor. Moreover, as defendant points out, "[n]udity is appropriate for bathing." This factor does not support a finding that the images defendant produced are pornographic, because the victim is not depicted in an unnatural pose. However, to say that the

activity in which the victim engaged is natural is not the same thing as saying that the images themselves are natural. That consideration, however, is best addressed in the context of the sixth prong.

The fourth factor we must consider is "whether the child is fully or partially clothed, or nude." Lamborn, 185 Ill. 2d at 592. Defendant properly does not contest this factor. Accordingly, this factor favors a finding that the images defendant produced are pornographic.

The fifth factor is "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity." Lamborn, 185 Ill. 2d at 592. The parties and the trial court focused upon one occurrence on the videotape where the babysitter appeared to touch the area of her vagina and then placed her finger in her mouth. On another occasion, the babysitter appeared to touch her genitals. The trial court found that though the conduct in question was innocent, it still could suggest sexual coyness and a willingness to engage in sexual activity. Our viewing of this portion of the tape reveals nothing of the sort. Indeed, this conduct was, as defendant suggests, something that people sometimes do in the bathroom. Therefore, this factor weighs against a finding that the videotape contains pornographic images.

We come, at last, to the sixth factor, "whether the visual depiction is intended or designed to elicit a sexual response in the viewer." Lamborn, 185 Ill. 2d at 592. This factor has proven quite difficult to apply. Two problems arise: first, intended or designed by whom, and, second, who is the viewer. Both appear to conflict with the directive that "[a] determination that a photograph constitutes child pornography focuses on the photograph itself." Lamborn, 185 Ill. 2d at 594. The first seems to require an inquiry into a defendant's state of mind, and the second appears to focus upon the reactions of viewers of the image. These things, however, are external to the image itself.

Indeed, some courts struggling to apply the sixth factor set forth in Dost have virtually abandoned it. Both the First and Third Circuits of the Federal Court of Appeals have come to the following conclusion: "*We believe that the sixth* **Dost** *factor, rather than being a separate substantive inquiry about the photographs, is useful as another way of inquiring into whether any of the other five* **Dost** factors are met." United States v. Villard, *885 F.2d 117, 125 3rd Cir. 1989* ; see United States v. Amirault, *173 F.3d 28, 35 1st Cir. 1999* . Indeed, this court conducted such an analysis in Lewis, 305 Ill. App. 3d at 678, essentially determining that the sixth factor did not indicate that the image at issue was pornographic, because the second and fifth factors did not. While treating the sixth factor in this manner poses no conceptual difficulties regarding deviating from the four corners of the image, it really adds nothing to the analysis and deprives the sixth factor of any true content. Contrary to the First and Third Circuits, we do not see how revisiting the first five factors in the guise of applying the sixth is a particularly useful exercise.

As for the first problem--intended or designed by whom--the resolution is simple enough. Given that the image must be judged on its own terms, a defendant's subjective intentions are irrelevant. Thus, the inquiry is necessarily limited to what the image itself says about itself. Put differently, only the characteristics of the image are relevant to determining whether it was created to evoke a sexual response in the viewer. Moreover, just as a defendant's subjective intentions cannot condemn an otherwise innocent image, neither can they save an otherwise pornographic one. The image must be evaluated solely on its own terms. Lamborn, 185 Ill. 2d at 594.

Turning to the second problem--the identity of the viewer--our supreme court, while emphasizing that whether a defendant is aroused by an image is not relevant, held that "viewer" refers to the objective viewer. Lamborn, 185 Ill. 2d at 594. If one were to take that holding to require an analysis of how the average, ordinary person would react to the image, the problem of

departing from the four corners of the image remains. The average person's reaction, like the subjective reaction of an individual pedophile, is something external to the image itself.

Furthermore, determining whether an image is lewd by reference to whether a sexual response would be elicited in an ordinary person (or perhaps an ordinary pedophile) creates a further problem. In Ferber, the Supreme Court held that "[t]he category of [depicted] 'sexual conduct' proscribed must also be suitably limited and described." Ferber, 458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct at 3358. Trying to determine what response an ordinary person would have to an image invites unguided speculation and undermines the balance of the analysis set forth in Dost. After carefully applying the first five factors, a court would then consider the reaction of an ordinary person without any concrete guidance whatsoever. Proceeding in this manner would run afoul of Ferber.

Moreover, why the reaction of an ordinary person is relevant to determining whether an image is child pornography is unclear. Cf. People v. Spargo, 103 Ill. App. 3d 280, 287 (1982) ("For example, if the court determines that the material is designed for the specially susceptible audience of *pedophiles, must the court then determine that the material is patently offensive and lacks serious literary, artistic, educational, political or scientific purpose or value to the average pedophile, or must the court make those determinations with reference to the* ordinary adult'?"). It would seem that child pornography would not elicit a sexual response in an ordinary person, as an ordinary person is not a pedophile. In the context of obscenity law, the United States Supreme Court was confronted with a similar argument:

"Indeed, appellant's sole contention regarding the nature of the material is that some of the books involved in this prosecution, those depicting various deviant sexual practices, such as flagellation, fetishism, and lesbianism, do not satisfy the prurient-appeal requirement

because they do not appeal to a prurient interest of the *average person in sex, that instead of stimulating the erotic, they disgust and sicken.* " Mishkin v. New York, 383 U.S. 502, 508, 16 L. Ed. 2d 56, 61-62, 86 S. Ct. 958, 963 (1966).

The Supreme Court rejected this argument, explaining:

"Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the Roth test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group." Mishkin, 383 U.S. at 508, 16 L. Ed. 2d at 62, 86 S. Ct. at 963.

It cannot be that the sixth factor of the Dost test requires a finding that an image would elicit a sexual response in an ordinary person in order for that factor to support a finding that an image constitutes child pornography. As the Supreme Court recognized in the context of obscenity, such a standard makes no sense. Ordinary people are not sexually stimulated by child pornography.

Taking "viewer" to refer to the ordinary pedophile is not satisfactory for several reasons. One commentator recognized the following problem: "But how are we to get inside the head of the pedophile and to see the world from his eyes?" *A. Adler, Inverting the First Amendment, 149 U. Pa. L. Rev. 921, 955 2001.* Moreover, if the criterion is whether a pedophile would find an image sexually stimulating, virtually any image of a child could be classified as child pornography. See 149 U. Pa. L. Rev. at 956 ("In fact, it is arguable that when viewed from the perspective of pedophiles, all children could be erotic"). *Thus, considering the objective viewer to be an ordinary pedophile creates other problems. In addition to departing from the four corners of the image and inviting unguided speculation, such a standard puts the trier of fact in the position of having to discern the mental state of a deviant*

group on a matter alien to the average person's understanding.  It also puts numerous obviously nonpornographic images at risk of being classified as pornography.

Indeed, the reaction of the "ordinary person" or the "ordinary pedophile" cannot be what the supreme court intended when it held that the "viewer" of the sixth prong is the *objective* viewer.  *Emphasis added and in original.*  Lamborn, 185 Ill. 2d at 594.  Either formulation conflicts with the court's holding that the image be evaluated on its own terms.  Thus, the court must have meant something else.

The only plausible meaning to ascribe to the term that limits the analysis to the four corners of the image is point of view.  That is, the question is whether the characteristics of the image invite the viewer to see the image from a particular perspective.  "Point of view" is defined as, *inter alia*, "a particular position" as in space, time, *development* from which something is considered or evaluated STANDPOINT, VIEWPOINT ‹from the *point of view* of a child, many things in the adult world are mysterious›.  *Emphasis added and in original.*  Webster's Third New International Dictionary 1750 (2002).  As the definition includes the "development" of an individual, as exemplified by the reference to the "point of view of a child," it is clear that "point of view" refers to both the physical-spatial orientation of the viewer toward an object and the mental condition of the viewer insofar as it affects the way the viewer sees the object.  An image may or may not invite a viewer to see an object from a particular point of view.

In the world of art, the concept is well known.  One art dictionary defines the term, in relevant part, as follows: "A position or angle from which something is observed or considered, and the direction of the viewer's gaze; a standpoint which is either a physical location or one in the mind. *** A manner of viewing things; an attitude.  The attitude or outlook of a narrator or character in a piece of literature, a movie, or another art form."  http://www.artlex.com/pm.html.  The same source defines "attitude," as used in the above definition, as "[a] mental position (feeling or emotion) concerning a fact or a state; a state of mind; a point of view or an outlook."

http://www.artlex.com/aru.html.  Often, the point of view from which the viewer sees the image is a result of the characteristics of the image itself.  See K. O'Neill, The Ambush Interview: A False Light Invasion of Privacy?, 34 Case W. Res. L. Rev. 72, 87 (1983) ("The interviewee's credibility may be further undermined by the effect of lighting, camera angle, camera movement, and sound recording.  The 'stalking' movement of the handheld camera as it aggressively approaches the subject may contribute to viewer perception of his guilt, or the cameraman may photograph the subject from a low angle to create a 'sinister' look").  Similarly, a photographic image might place "its viewer in an epistemically privileged position, one step removed from the eyewitness."  L. Harmon, Fishing Deep Waters: Tributes & Commentaries: The Canyon of Doubt: John William Corrington's the Risi's Wife, 26 Legal Stud. Forum 859, 863 2002 . Moreover, images themselves establish a point of view regardless of their creator's intent.  Cf. P. Quint, Free Speech and Private Law in German Constitutional Theory, 48 Md. L. Rev. 247, 300 n.173 (1989) ("Moreover, the documentary form is particularly dangerous because the film's point of view is often accepted as a representation of reality").  Quite simply, artistic images affect their viewers.  See J. Nivala, The Landscape Art of Daniel Urban Kiley, 29 Wm. & Mary Envtl. L. & Pol'y Rev. 267, 322 (2005), quoting T. Joffrain, Deriving a (Moral) Right for Creators, 36 Tex. Int'l L.J. 735, 785  (2001) and V. Zlatarski, "Moral" Rights and Other Moral Interests: Public Art Law in France, Russia, and the United States, 23 Colum.-VLA J.L. & Arts 201 (1999) ("If we accept the notion that art is expression, something to express feeling and transmit understanding no matter the medium,' then landscape design is art--visual art.  It is also public art, which 'does not merely present a collection of formal aesthetic attributes; it alters its environment, affects its viewer, and forges moral meaning' "); S. Nahmod, Artistic Expression and Aesthetic Theory: The Beautiful, The Sublime, and The First Amendment, 1987 Wis. L. Rev. 221, 256 (1987) ("Moreover, while nonrepresentational art often involves

the use of forms chosen by the artist to create a certain feeling in the viewer, these forms also reflect the artist's view of the world"). Visual art consists of images, and, while it would be a stretch to call what defendant created art in the same sense that it would be to call candid family photographs art (at least in the traditional sense), any image might place the viewer into a particular point of view.

Returning to the world of the law, a more concrete example might prove more helpful. In obscenity prosecutions, the question of whether a work has some redeeming value is a part of the analysis. See People v. Page Books, Inc., 235 Ill. App. 3d 765, 773 (1992). In City of Chicago v. Geraci, 46 Ill. 2d 576, 583 1970, the question arose as to whether a 10-page introduction by a doctor that purport ed to place the contents of an otherwise obscene book into some psychological perspective vested the book with some redeeming value such that it fell within the protection of the first amendment. In essence, the defendant was arguing that the introduction altered the nature of the book because it altered the point of view from which the viewer would perceive the material. Although the supreme court ultimately rejected the defendant s argument, finding the introduction a "hollow subterfuge," it took the argument seriously. Geraci, 46 Ill. 2d at 583-84. If, in fact, the introduction had not been simply a ruse to escape an obscenity prosecution, the material could not have been deemed obscene. This is solely because the introduction would have created an atmosphere where the reader would have been encouraged to perceive the balance of the book from an appropriate point of view. Hence, the point of view in which a work places a viewer is a characteristic of the work itself and can change the very nature of the work.

If the sixth factor of Dost refers to the point of view, if any, in which the image places the viewer, the problems set forth above are largely avoided. Because the perspective of the viewer is determined from the characteristics of the image, there is no reference to matter outside of the four corners of the image. Similarly, the inquiry does not focus upon the hypothetical reaction of the average viewer or the average pedophile, which also lies outside of the image. Indeed, reaction per

se becomes irrelevant. The inquiry does not focus upon the reaction of a viewer, objective or otherwise, having been invited to view the work from a certain point of view. It simply asks, in which point of view does the image place the viewer? This approach does not require the trier of fact to ascertain the state of mind of a pedophile. Moreover, it avoids the problem of transmuting otherwise ordinary images into child pornography simply because they might arouse a pedophile. Thus, we believe that the proper inquiry focuses upon whether the image invites the viewer to perceive the image from some sexualized or deviant point of view. Cf. United States v. Wiegand, 812 F.2d 1239, 1244 (9th Cir. 1987) ("[L]asciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles" (emphasis added)). As noted above, not all of the Dost factors need be present in order to find that an image is child pornography. Lamborn, 185 Ill. 2d at 592. It may turn out that in the majority of cases, this factor will have little application. However, our approach has the virtue of restoring to the sixth factor some content independent of the first five, and it confines the analysis to the four corners of the image. In certain circumstances it may prove a useful tool for evaluating a particular image. This is one such case.

In the present case, we must first remember that we are assessing images. We are not simply deciding whether a naked teenaged girl bathing a naked infant is lewd. Indeed, the conduct depicted is properly assessed under the third prong of Dost. Lamborn, 185 Ill. 2d at 592. Instead, we must determine whether the videotape that defendant produced is lewd. Our final inquiry to this end is whether the images invite the viewer to see the activity on the tape from some sexualized or deviant point of view. We conclude that they do.

Essentially, the tape places the viewer in the role of voyeur. There is no narrative or plot.

The images are not a scene connected to anything else.[1] In watching the tape, the viewer stands in relation to the victim as would a peeping tom. This point of view is reinforced by the fact that the victim does not react to the camera whatsoever. Whether an image is candid or posed has been deemed relevant in determining whether an image is lewd. See Villard, *885 F.2d at 125*; Doe v. Chamberlin, 139 F. Supp. 2d 637, 648 (M.D. Pa. 2001). Generally, as suggested by the third factor, certain poses would support a finding that an image is lewd. However, where, as here, the viewer is placed in the point of view of a voyeur, that the images are candid contributes to their lewdness. Because the victim does not react, the image creates a sense of covert observation that would not otherwise exist.

Voyeurism is sexually motivated conduct, and it is recognized as deviant behavior. See In re Marquardt, 100 Ill. App. 3d 741, 745 (1981) *In addition to drug abuse, the following are classified as mental disorders in various editions of DSM sexual deviations, including homosexuality, fetishism, pedophilia, voyeurism*"); People v. Penney, 7 Ill. App. 3d 191, 197 (1972) ("The story is replete with *accounts of intercourse, rape, cunnilingus, voyeurism, fellatio, lesbianism and other abnormal sexual* acts"). Thus, by placing the viewer in the role of voyeur, the images become sexualized. Moreover, they are sexualized in a way consistent with deviant behavior.

---

[1]We are cognizant that, under Ferber, 458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358, "the material at issue need not be considered as a whole." We do not here mean to suggest that an otherwise pornographic image could be saved by the balance of a work. However, here, we are not concerned with balancing the value of a work as a whole with a particular scene, as in an obscenity case. We are asking whether the overall nature of the work colors the images themselves.

Here, that the point of view in which the viewer is placed leads to the conclusion that the tape is lewd can be seen by comparing it with a certain photograph at issue in Lamborn. In that case, the supreme court determined that the photograph was not lewd. The court explained, "This photograph is best described as capturing an uninhibited moment of adolescent spontaneity, in which two teenage girls whimsically pull off their bikini tops while swimming together." Lamborn, 185 Ill. 2d at 593. In other words, the photograph was of the sort that friends might take of friends. The videotape at issue here is of a totally different nature. These are not the type of image described in Lamborn, nor do they bear any similarities with the sort of photograph a parent might take of a young child bathing. It is different because it places the viewer in the position of a voyeur rather than that of a parent observing a young child bathing or that of a friend, as the picture suggested in Lamborn. Accordingly, this prong of Dost indicates that the images defendant created are lewd.

In sum, the first, fourth, and sixth factors all indicate that the videotape defendant produced is lewd and therefore child pornography within the meaning of section 11--20.1 (720 ILCS 5/11--20.1 (West 2002)). The victim was fully nude, the tape contained images that focused upon her genitalia, and the characteristics of the tape place the viewer in the perspective of a voyeur. Three factors, the second, third, and fifth, militate for a different conclusion. The setting was not sexually suggestive, the victim was not depicted in an unnatural pose or attire, and the victim did not exhibit sexual coyness or a willingness to engage in sexual activity. However, given the voyeuristic nature of the videotape, the fifth factor is entitled to little weight. One simply would not expect the victim to exhibit sexual coyness or a willingness to engage in sexual activity while engaged in normal activity. The fact that she exhibited neither, under such circumstances, does not undermine the lewd nature of the videotape. Likewise, that the images were not posed does not undercut the voyeuristic nature of the images. Considering the totality of the videotape in light of the six considerations articulated in Dost, we conclude that the tape is lewd. Therefore, we affirm defendant s conviction.

In a related argument, defendant contends that the legislature did not intend section 11--20.1 (720 ILCS 5/11--20.1 (West 2002)) to apply to what he terms "peeping tom" cases such as this one. As evidence of this intent, he compares section 11--20.1 to new amendments to section 26--4 of the Code (720 ILCS 5/26--4 (West 2004)), which make unlawful videotaping of a minor a felony in certain circumstances, and section 11--20.2 of the Code, which imposes an obligation upon film processors to report to a peace officer photographic images of minors engaged in sexual conduct 720 ILCS 5 11--20.2 West 2004 . Defendant claims that these statutes should be read in pari materia with section 11--20.1.

The principle that statutes that relate to the same subject should be read in pari materia is a principle of statutory construction. See Mowen v. Holland, 336 Ill. App. 3d 368, 374 2003 . Therefore, the rule applies only when it is necessary to resolve a statutory ambiguity. People v. Aleman, 355 Ill. App. 3d 619, 626 2005 . Defendant has not attempted to establish that section 11--20.1 is ambiguous in any way. Thus, absent an ambiguity, it is unnecessary for us to construe the statute.

Before concluding this portion of this opinion, we note that defendant has set forth, as a separate argument, that the trial court erred by allowing evidence regarding the circumstances under which the images were produced. As is clear from the above discussion, we agree with this contention. It does not, however, provide a basis for reversal. Because we are conducting de novo review, our conclusion that the images at issue here constitute child pornography was arrived at independently of and without deference to the trial court s decision. We did not consider evidence external to the images in reaching this conclusion. It is well settled that we may affirm on any basis apparent in the record. People v. Braggs, 209 Ill. 2d 492, 519 2003 .

Finally, defendant also contends that his sentence is excessive. The propriety of a sentence is a matter lying within the discretion of the trial court, and we will not interfere with that discretion unless it is abused. People v. Roberts, 338 Ill. App. 3d 245, 251 2003 . An abuse of discretion occurs where

no reasonable person could agree with the position taken by the trial court. *People v. Allen*, 351 Ill. App. 3d 599, 605 (2004). Indeed, a trial court, as it has the opportunity to observe a defendant and hear evidence firsthand, is in the best position to take into account such things as the defendant's character, demeanor, credibility, social environment, and habits; therefore, the trial court has wide latitude in imposing a sentence so long as it does not ignore relevant mitigating evidence or consider improper factors in aggravation. *People v. Bilski*, 333 Ill. App. 3d 808, 819 (2002). A court of review, then, may not simply reweigh the evidence and substitute its judgment for that of the trial court. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). Where mitigating evidence has been presented, the trial court is presumed to have considered it. *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994).

Defendant asserts that he is not simply asking this court to reweigh the evidence that the trial court considered; however, a reading of his argument reveals that that is exactly what defendant is doing. Defendant contends that his sentence is excessive because (1) he has no criminal background; (2) he was sexually abused as a child; (3) he was a poor student who went on to become a successful businessman; (4) a psychologist and a doctor who specializes in treating sex offenders opined that he was a low risk to reoffend and a good candidate for a community-based plan; (5) the sentence will create an undue hardship for his five children, who depend on his income and support; (6) he has a good general character and attitude; and (7) he has been sober for over 16 years and is an active participant in Alcoholics Anonymous, where he has helped other people. After setting forth these points, defendant simply argues that "it defies logic that this defendant has never touched anyone improperly [i.e., did not commit an Aggravated Criminal Sexual Abuse, which is probational] and failed to get the minimum four-year sentence." Defendant is, in essence, asking us to reconsider the evidence presented to the trial court (and, perhaps, to conduct a cross-comparison analysis with the crime of aggravated criminal sexual abuse (720 ILCS 5/12--16 (West 2004)); however, such an argument is no longer viable in light of People v. Sharpe, 216 Ill. 2d 481 (2005).

In addition to asking us to do something we cannot, that is, reweigh the evidence, defendant s argument ignores several aggravating factors upon which the trial court relied. Notably, defendant fails to mention the trial court s finding that defendant s conduct threatened serious emotional harm to others and that a need existed to deter defendant and other people from engaging in the conduct in which defendant engaged. Thus, contrary to the implication of defendant s argument, not all considerations militated for a minimum sentence.

Indeed, the trial court expressly relied upon numerous considerations. It began its ruling by stating that it had considered all of the evidence as well as the factual basis for the pleas defendant entered on the unlawful videotaping counts. It stated that it considered the presentence investigation and the reports provided by the psychologist and the doctor who specializes in treating sex offenders. The trial court acknowledged the financial impact of incarceration, both on the State and on defendant s children. The court next noted defendant s childhood, including the abuse defendant suffered and educational difficulties he experienced. It then credited defendant with relieving people of the burden of testifying by pleading guilty on the unlawful videotaping counts, and it noted that this indicated an acceptance of responsibility. The court observed that defendant cared for and supported his children. Additionally, the court stated that it considered defendant s  industry in putting together a business. Finally, the court noted defendant s lack of a criminal history. In aggravation, the court first found that defendant s behavior threatened serious emotional harm to others. It also expressly cited the need for deterrence, regarding both defendant and others.

The court added that it was considering the arguments of the attorneys as to sentencing alternatives defendant s statement, in which he indicated remorse  and the victim impact statements. The court noted that it had heard from people who testified that defendant is a person of integrity  that he puts his children first  that he is caring and considerate  and that he was helpful as a brother, insightful as a mentor, and helpful to others. The court indicated that it had read statements submitted upon defendant s behalf as well as information received from experts on addiction.

The court then went on to note the effect defendant's actions had upon his victims.[2] It observed that the victims felt betrayed, ashamed, violated, embarrassed, and angry. Also, many testified that they had started to feel guilty, though they had done nothing wrong. The court further noted that several indicated that they felt fear and that for the rest of their lives they may always fear whether someone is filming them or watching them.

The court then again noted defendant's expression of remorse, but stated that "you certainly have a long way to go." It also noted defendant's participation in Alcoholics Anonymous. Finally, before pronouncing defendant's sentence, it reiterated that it was considering "all the factors that" it "was required to consider." The court then sentenced defendant to eight years' imprisonment.

We cannot say that no reasonable person could agree with the trial court that an eight-year sentence was appropriate. Defendant correctly points out that substantial mitigating circumstances exist. There were, however, substantial aggravating factors as well. Thus, a reasonable person could conclude that a sentence in excess of the minimum was warranted. Moreover, defendant could have been sentenced to up to 15 years' imprisonment, so the sentence defendant received was closer to the minimum for a Class I felony. See 730 ILCS 5 5--8--1 (West 2002). Defendant was thus shown some leniency. Defendant's assertion, that he is not asking us to reweigh the evidence but simply to conclude that the trial court abused its discretion in

---

[2] In addition to the babysitter discussed above, defendant's pleas of guilty to unlawful videotaping involved other victims.

light of all the circumstances of the offense and his personal history, is ill-founded. Making such a determination would appear to us to involve reweighing the evidence, and defendant does not explain how it would not. We therefore must reject defendant's argument.

In light of the foregoing, we hold that defendant was properly convicted and sentenced in the trial court below. The videotape defendant produced constitutes child pornography, and the sentence defendant received was not excessive. Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON and KAPALA, JJ., concur.