2019 IL App (1st) 172507-U

No. 1-17-2507

Order filed November 14, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 7213 |
| | ) | |
| RUDY WILLIAMS, | ) | Honorable |
| | ) | William Raines, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not significantly, if at all, rely on a finding of great bodily harm in imposing sentence, and defendant's 15-year sentence for aggravated battery with a firearm is not excessive.

¶ 2   Following a bench trial, defendant Rudy Williams was convicted of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) and sentenced to 15 years in prison. On appeal, defendant contends that at sentencing, the trial court improperly relied on an aggravating

factor–great bodily harm–for which there was no evidentiary support. Defendant further contends that his sentence is excessive. For the reasons that follow, we affirm.

¶ 3   Defendant's conviction arose from the April 6, 2016, shooting of Otis Betts. Following his arrest, defendant was charged by indictment with one count of aggravated battery with a firearm, one count of aggravated discharge of a firearm, two counts of unlawful use of a weapon by a felon (UUWF), and four counts of aggravated unlawful use of a weapon (AUUW). Prior to trial, the State proposed an offer of 10 years in prison in exchange for a guilty plea to the charge of aggravated battery with a firearm. Defendant did not accept the offer. Subsequently, the State nol-prossed one of the counts of UUWF and all four counts of AUUW. The case proceeded to a bench trial on one count each of aggravated battery with a firearm, aggravated discharge of a firearm, and UUWF.

¶ 4   At trial, Otis Betts testified that in 2016, he worked front door security at a nightclub in Chicago. He knew defendant, whom he identified in court, as a regular at the club, and explained that he and defendant would sometimes engage in small talk and short conversations. On the night in question, the club was "packed" by 10:45 p.m. As such, Betts was only allowing one person in for every three people who left, per the club owner's policy. A little after 11 p.m., defendant arrived at the club with another man. Betts and another security guard informed them that the club was at capacity, so they could not enter until other people left. Defendant peeked inside the door and tried to go inside, but the other security guard blocked him and defendant said, "We gonna get in one way or another." After about 10 minutes, defendant and the other man left.

¶ 5      Around 40 to 45 minutes later, defendant returned to the club by himself. When Betts again explained to him the club policy regarding capacity, defendant "got a little irate" and took a step toward Betts. However, at that point a vehicle pulled up, driven by a man who Betts thought was the man defendant was with earlier. Defendant entered the vehicle. Betts went inside the club, where he assumed a spot on a security chair near the front door.

¶ 6      Shortly thereafter, the club DJ, who had been outside on a cigarette break, came inside and told Betts that "the guy [Betts] got into it with earlier" was back. Betts looked out the window next to the door and observed defendant standing outside. As Betts watched, defendant came to the door and opened it a crack. Betts gestured "no" to him and closed the door. When defendant opened the door a second time, Betts told him he still could not come in and pulled the door closed. As Betts was stepping away from the doorway, defendant yanked the door open, extended his arm while holding a gun, fired one shot into the club, and ran off.

¶ 7      Betts ran behind a pillar, "where everybody was." After the front door closed, Betts noticed a tingling in his left thigh, so he went into the bathroom to see what was wrong. There, he noticed blood dripping from his hand. When he pulled up his sleeve, he realized he had been shot in the wrist. Betts then went outside, where he told a responding police officer what happened. About 15 to 20 minutes later, he observed defendant in a police squadrol. Betts was thereafter taken to the hospital in an ambulance. When asked about the treatment he received at the hospital for his wrist, Betts stated, "They flushed it with a fluid, took x-rays, made sure I had no broken bones, made sure anything wasn't fractured. Everything came back negative. They flushed it again, gave me a couple Ace bandages, some ointment, and that was it."

¶ 8    Chicago police officer Thomas Robinson testified that on the night in question, he and his partner were on patrol on a beat that included the area where the nightclub was located. Around 1:20 a.m., Robinson noticed "some kind of altercation or argument" in the club's parking lot between a security officer and defendant, whom he identified in court. Defendant then went to the back of the parking lot and entered into a car. Robinson and his partner spoke with the security guard, who related that defendant was upset at being denied entry to the club because it was full.

¶ 9    After the officers returned to their squad vehicle, which was parked across the street, Robinson heard a gunshot. He observed a person run from the back of the club and enter into a vehicle. The officers followed the vehicle for a few blocks and curbed it. Before the vehicle was fully stopped, the passenger door opened, and defendant exited and started running. Robinson pursued defendant on foot, caught him, and placed him in custody.

¶ 10    Chicago police officer Sherman Morris testified that he followed Robinson's pursuit of defendant. When Morris caught up with them, defendant was on the ground. Morris found a loaded .38 special revolver on the ground about a foot from defendant. Morris recovered and inventoried the gun.

¶ 11    An evidence technician who processed the crime scene testified that she found and recovered one fired bullet near the club's entrance. The State introduced into evidence a certified copy of conviction indicating that defendant previously had been convicted of UUWF and possession of a controlled substance.

¶ 12    Defendant testified that he arrived at the nightclub around 11 p.m. on the night in question, but Betts said he was not letting anyone inside at the time and did not give any reason.

Defendant remained outside in the parking lot, drinking with 10 or so other people who were present. After about 15 minutes, he attempted to enter a second time, but was again denied. According to defendant, he did not try to gain entry again after that. At some point, he heard a gunshot and observed people running. Defendant ran across the street and then continued to run. Defendant denied being in an altercation with Betts. On cross-examination, defendant denied ever entering a vehicle. He explained that he ran until he fell, and then the police grabbed him and put him in a squadrol. At the station, he told the police "everything."

¶ 13    The trial court found defendant guilty on all three counts: aggravated battery with a firearm, aggravated discharge of a firearm, and UUWF.

¶ 14    At sentencing, the court began by stating it had reviewed the presence investigation (PSI) report. After the court indicated defendant would receive 501 days of presentence custody credit, defendant read to the court a letter he had drafted. Defendant stated as follows:

> "First off, your Honor, I would like to start off by saying I am truly sorry and take full responsibility for my actions leading up to this incident.
>
> Your Honor, due to the depression lead [*sic*] to my intoxication and to be honest, your Honor, I really can't remember what took place or what really happened this date of the incident, but I do take full responsibility and I'm sorry.
>
> * * *
>
> I still try to remember what happened the night of April 16, 2016, but I just can't fully remember and how this all happened to me. But what I do remember, your Honor, is that I am not a shooter. I am not a killer. I am not a robber. I am not a gang banger or none of the above. I have no violence in my background. I also have no Class X in my

background as well. But I have made bad decisions in my lifetime, but I am not a bad person."

Defendant related that prior to his arrest, he was working full-time at a candy factory, spending a lot of time with his children, and going to church. He stated that after his father died in February 2016, he became depressed and started drinking heavily. Defendant recalled that in the past, another judge had mandated him to attend a treatment program, which he successfully completed, and which helped him understand why he made some of the bad decisions in his past. Defendant also reported that he had received a certificate from a health education program at the University of Illinois, attended Alcoholics Anonymous meetings, and attended church services. Defendant stated that, if given another chance, he would not let down the court, his family, his children, or his sobriety.

¶ 15    The trial court informed defendant that it had read the PSI report and the letters defendant had submitted, and had looked at the five certificates he provided. The court also indicated that the counts charging aggravated discharge of a firearm and UUWF merged into the count charging aggravated battery with a firearm.

¶ 16    The State then argued in aggravation that defendant had a "fairly substantial" criminal history that included two domestic battery offenses, more than one conviction for possession of a controlled substance, at least two gun offenses, and a conviction for possession of contraband while in prison. The prosecutor argued that, given the domestic batteries, it could not be said defendant had no history of violence. With regard to the facts of the case, the prosecutor asserted that because defendant fired into a crowded bar, the situation "could have been a lot worse *** [b]ut fortunately for him, the bullet that he fired knowingly from that gun only struck the wrist

causing great bodily harm, which we would be asking your Honor to make as part of your finding to the victim in this case."

¶ 17    In mitigation, defense counsel argued that defendant was taking "direction and responsibility," had been gainfully employed, and had committed the shooting while depressed due to his father's passing away.

¶ 18    The court commended defendant for his "success while in custody" and told him he was heading in the right direction by participating in programs. However, the court also stated that it had to balance the mitigation with defendant's "fairly significant" criminal history, which included "guns in [his] background" and a conviction for having contraband in a penal institution. The court then pronounced sentence as follows:

> "But the man I see here now asking for some leniency, right, is not the man that I see in the pretrial and presentence investigation. It's not the man who I listened to your trial, you know. If I were to separate you today from your history and the facts of this case, you are not the same person. I find–I ruled that I have a finding of great bodily harm. You shot the guy. I do that [*sic*].
>
> The issue for me is what kind of sentence to give you, and I was actually thinking somewhere in the mid 20s, you know, at 85 percent. I like what I heard today. Okay? I want to give you an opportunity to live a life. I want to give you an opportunity to see your family. I want to give you an opportunity to change. I can't do that for you. I have not walked a mile in your shoes. You have to do that. You have to–you're going to be punished. That's all there is to it. It's the part of my job I hate. I don't want to send anybody to jail. I want to give everybody the benefit of the doubt if I can do it, but I have

a job to do too. I have to protect the public from individuals who go and shoot people, and you're one of those people.

* * *

You shot somebody. You shot into a bar.

So I have to come to a reasonable sentence what's reasonable. You know, it's not going to be 6 years. I decided it's not going to be into the 20s. But what I'm going to do is I'm going to give you the benefit of the doubt, and I'm going to sentence you to 15 years in the Illinois Department of Corrections at 85 percent. 15. And I was thinking about 25. That's where I was heading with this. So your attorney shaved off 10 years of that sentence by what he had to say and what you had [to] say. Do you understand? I dropped it by 10 years. That's 8 ½ years in prison that you do not have to serve. Do you understand? So I'm leaning in your direction.

You could have killed somebody. You could have been charged with attempted murder and would be looking at a lot heavier sentence. And I'm shocked that you weren't charged with attempted murder, but I deal with the charges that I deal with."

¶ 19    On appeal, defendant contends that at sentencing, the trial court improperly relied on "great bodily harm" as an aggravating factor, despite there being no evidentiary support for such a finding. He further contends that his sentence is excessive. Defendant acknowledges that he did not file a motion to reconsider sentence, and that these sentencing issues are therefore forfeited for appellate review. Nevertheless, he argues that his contentions may be reached (1) because forfeiture is less rigid where the basis for the objection is the trial judge's conduct, (2) under either prong of the plain error doctrine, or (3) where defense counsel was ineffective for failing

to preserve the issues. Whether forfeiture may be avoided under any of these theories requires us to first determine whether any error occurred. See *People v. Johnson*, 238 Ill. 2d 478, 490-91 (2010) (excusing forfeiture based on the trial judge's conduct is warranted only when the trial court has overstepped its authority); *People v. Cosby*, 231 Ill. 2d 262, 273 (2008) (the first step in plain error analysis is determining whether an error actually occurred); *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection.").

¶ 20    Defendant first argues that it was improper for the trial court to rely on a finding of "great bodily harm" in imposing sentence in the instant case because the evidence at trial established only a minor, inconsequential wound that apparently caused Betts no pain and that needed no treatment beyond a bandage and some ointment. Relying on cases that have defined the term "great bodily harm" in the context of the aggravated battery statute, defendant asserts that to constitute "great bodily harm," an injury must be significantly greater and more serious in nature than a simple battery, and that there must be a showing of pain or damage to the body, such as lacerations, bruises, or abrasions. Further relying on these cases, defendant points out that a gunshot wound does not necessarily amount to "great bodily harm."

¶ 21    "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Whether a court relied on an improper factor in imposing a sentence presents a question of law that we review *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. In considering whether reversible error occurred, a reviewing court should make its decision based

on the record as a whole, rather than focus on a few words or statements of the trial court. *People v. Miller*, 2014 IL App (2d) 120873, ¶ 37.

¶ 22    Contrary to defendant's position, we cannot find that the trial court significantly relied on a finding of great bodily harm when imposing sentence. To be sure, during the course of pronouncing sentence, the trial court mentioned that it had made a finding of "great bodily harm." However, this comment was made only once, and just in passing. The bulk of the trial court's remarks explaining its reasons for imposing a 15-year sentence had nothing to do with the degree of harm suffered by Betts. The court highlighted that defendant had shot into a bar, could have killed someone by doing so, and could have been charged with attempted murder based on his actions. The court stated that it had to protect the public, noted defendant's criminal history as it was outlined in the PSI report, and specifically stated that going into the sentencing hearing, it was considering imposing a sentence "in the mid 20s." However, based on defendant's remarks in allocution and defense counsel's arguments in mitigation, the court "shaved off 10 years of that sentence" because it wanted to give defendant an opportunity to change.

¶ 23    Having considered the record of the sentencing hearing as a whole, we find that the trial court's passing reference to "great bodily harm" was, at best, a minimal part of its sentencing decision. Any weight placed on that finding was so insignificant that it did not lead to a greater sentence, and as such, there was no error. See *People v. Lightfoot*, 2014 IL App (1st) 130883, ¶ 35. In the absence of error, the issue remains forfeited.

¶ 24    Defendant's second argument is that the trial court's imposition of a 15-year sentence constitutes an abuse of discretion in light of the significant, concrete, and successful steps he was

taking while awaiting trial to improve himself and overcome his addition to alcohol. He asserts that his sentence is excessive because he had a consistent employment history, had strong family ties, and supported his family financially. Defendant maintains that the trial court allowed the need for punishment to override the objective of rehabilitation and the significant mitigating factors present in the case. As evidence of the court's desire for punishment, defendant notes that prior to trial, the State offered a plea deal for 10 years in prison, thus indicating "that the State believed 10 years was an appropriate sentence given the facts of the crime." As relief, defendant seeks to have his sentence reduced or the cause remanded for resentencing.

¶ 25    Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007). Sentences that fall within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 26    Here, the record indicates that the trial court was well aware of the mitigating factors identified by defendant on appeal. All of these factors were included in the PSI report or highlighted by defendant and his attorney at the sentencing hearing. Where mitigating evidence has been presented, it is presumed that the trial court considered it. *People v. Sven*, 365 Ill. App. 3d 226, 242 (2006). Here, the trial court stated that it did consider the mitigating evidence. The

trial court indicated it was swayed by defendant's statement in allocution, commended him for participating in programs, and wanted to give him an opportunity to change. As for the State's plea offer, the mere fact that a defendant is given a greater sentence than was offered during plea bargaining does not, by itself, establish that he was punished for demanding trial. *People v. Carroll*, 260 Ill. App. 3d 319, 348 (1992). Here, the State proposed a 10-year sentence in exchange for a guilty plea to *one* offense, but defendant was found guilty after trial of *three* offenses that the trial court merged prior to sentencing. Under these circumstances, we cannot agree with defendant that the disparity between the plea offer and the imposed sentence evidences an overriding desire for punishment on the part of the trial court. See *Carroll*, 260 Ill. App. 3d at 349. Defendant's reasoning is not persuasive.

¶ 27 Aggravated battery with a firearm is a Class X offense. 720 ILCS 5/12-3.05(e)(1), (h) (West 2016). Here, the trial court sentenced defendant to 15 years in prison, a term well within the permissible Class X sentencing range of 6 to 30 years. 730 ILCS 5/5-4.5-25(a) (West 2016). Given the facts of this case, the interests of society, and the trial court's stated consideration of the mitigating and aggravating factors, we cannot find that defendant's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 28 For the reasons explained above, we affirm the judgment of the circuit court.

¶ 29 Affirmed.