NOTICE
Decision filed 06/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250568-U

NO. 5-25-0568

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 22-CF-1533 |
| | ) | |
| KELLY NICHOLS, | ) | Honorable |
| | ) | Lindsey A. Shelton, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where the charged images were not lewd as a matter of law under the *Lamborn* factors set out by the Illinois Supreme Court, the defendant was not guilty of manufacturing or possessing child pornography.

¶ 2   The defendant, Kelly Nichols, appeals her conviction following a bench trial in the Macon County Circuit Court in which she was convicted on one count of manufacturing of child pornography (Count III) and ten counts of possession of child pornography (Counts I, IV, XI, XII, XIII, XIV, XV, XVI, XVII, & XVIII).

1

¶ 3                                    I. BACKGROUND

¶ 4     On November 30, 2022, the defendant, Kelly Nichols, was charged by grand jury indictment with six counts of manufacturing child pornography[1] and twelve counts of possessing child pornography. 720 ILCS 5/11-20.1(a)(1), (a)(6) (West 2020). These charges were predicated on photographs and videos of the defendant's minor daughters taken between 2002 and 2016 and were found on a computer and an external hard drive in the defendant's home. The defendant's husband, Douglas Nichols, who is not a party to this appeal, was also charged in Macon County Circuit Court case 2022-CF-1531 with possession of the same images and videos.

¶ 5     On August 9, 2023, the defendant filed a motion to dismiss the indictment, arguing that, as a matter of law, the images and videos charged did not meet the legal standard for lewdness under *People v. Lamborn* (185 Ill. 2d 585 (1999)) and therefore the images did not constitute child pornography.

¶ 6     On September 15, 2023, the trial court heard arguments on the defendant's motion to dismiss the indictments against her. At the conclusion of the hearing, the court created "Court's Exhibit One," which contained all of the photos and videos charged that the court had observed during the hearing. On September 24, 2023, the court ruled that 12 of the 18 charged counts[2] could proceed because a reasonable trier of fact *could* find them lewd. The trial court also dismissed 6

---

[1] The Illinois legislature has changed the language of this statute from "child pornography" to "child sexual abuse material," noting that the term pornography implies consent, which can never be given in sexual material involving children. 720 ILCS 5/11-20.1(a) (modified by Pub. Act 104-245 (eff. Jan. 1, 2025)). While we acknowledge and agree with the legislature's reasoning for the change in the language of the statute, for the purposes of consistency and clarity in this appeal, we will use the "child pornography" terminology in use at the time the record was created.

[2] The charged counts that the trial court ruled in its September 24, 2023, order could continue were counts I, II, III, IV, XI, XII, XIII, VIX, XV, XVI, XVII, and XVIII of the grand jury indictment.

2

of the 18 counts[3], finding that, as a matter of law, a reasonable trier of fact *could not* find that the charged videos were lewd.

¶ 7    On September 26, 2024, the defendant's bench trial began. The State waived its opening statement, and the defense reserved its opening statement until its case in chief began. The parties then agreed to the admission of the charged exhibits into evidence as Court's Exhibit 1.[4] The State then called its only witness, Detective Eric Matthews of the Decatur Police Department, to testify. Detective Matthews testified that he had been in the department's juvenile division since 2012 and had over 250 hours of training in computer and cell phone forensics. He explained that the images in Court's Exhibit 1 were the same ones he had recovered during his investigation. He testified that during his investigation, he had learned that the defendant had two daughters, Ky.N. (born November 4, 2000) and Ki.N. (born October 1, 2002). He further testified that the images were recovered from a Dell computer and an external hard drive while serving search warrants on the defendant's residence for an unrelated crime. Detective Matthews explained that three of the charged items, People's Exhibit 4[5] (Counts I-III), People's Exhibit 5[6] (Count IV), and People's Exhibit 13[7] (Count XVIII), were recovered from the computer.

---

[3] The charged counts that the trial court ruled in its September 24, 2023, order must be dismissed were counts V, VI, VII, VIII, IX, and X of the grand jury indictment.

[4] The photographs and videos charged were collectively admitted as "Court's Exhibit 1" at trial; however, in order to ensure clarity, we will refer to each photograph or video according to its individual "People's Exhibit" designation, which was used during trial to distinguish the photos and videos from one another.

[5] People's Exhibit 4 is a short video of adolescent Ki.N. wearing only underwear, jumping on a pogo stick.

[6] People's Exhibit 5 is a short video of adolescent Ki.N and her adolescent female cousin in the shower, singing.

[7] People's Exhibit 13 is a photograph that appears to be a still image from People's Exhibit 5, the shower video.

¶ 8    He further explained that People's Exhibit 6[8] (Count XI), as well as People's Exhibits 7, 8, 9, 10, 11, and 12[9] (Counts XII through XVII, respectively), were recovered from the external hard drive. Detective Matthews testified that from the data stored with the photo, he could tell that People's Exhibit 4 was taken on January 4, 2014, and was recorded with an Apple iPhone 5s. He testified that, based on the contents of other photos taken around the same time, he believed that both defendant and Ky.N. were using an iPhone 5s in 2014. Detective Matthews also testified that from the data stored with the photo, he could tell that People's Exhibit 5 was taken with an iPhone 6s Plus on July 31, 2016. He also stated that he found "selfies" of the defendant taken on the same device around the same time. Detective Matthews further testified that People's Exhibit 6 was taken with a Sony Cyber-Shot camera on January 6, 2002, and People's Exhibits 7 through 12 were taken with a Sony DSC-P150 camera but was unsure of the time range when the photos were taken.

¶ 9    Finally, the State asked Detective Matthews about a video marked as People's Exhibit 14. Defense Counsel objected on the grounds of relevance, as it was not a charged photograph, and the court overruled the objection, finding the video went to identification of the defendant's voice and was therefore admissible for that limited purpose. He then testified that he recognized the voice in the video as belonging to the defendant.

¶ 10    Following a brief recess, defense counsel then cross-examined Detective Matthews on his training, experience, and process of extracting and analyzing the data from the computers. Detective Matthews testified that he did not find any internet searches for or downloaded videos of child pornography on the computer. He testified that "Chrome login artifacts" showed that all

---

[8]People's Exhibit 6 is a photograph of two infants and a toddler lying fully nude on a made bed.
[9]People's Exhibits 7, 8, 9, 10, 11, and 12 are a series of photographs that depict Ky.N. and Ki.N. as young children fully nude with toilet paper wedged between their buttocks as if they had tails.

4

four members of the Nichol's house had used the computer, and he was unable to state when the last time someone used it was. He also testified that when he examined the devices, he first made exact copies of them.

¶ 11    As to People's Exhibit 5, Detective Matthews testified that the video was stored on the computer under a partial file path of "user\douglas\pictures" and that the People's Exhibit 13 had the same file path. He testified that the iPhone 6s Plus's backup data showed that the defendant's email and phone number were associated with the iPhone that recorded those videos. Next, he testified that, in regard to People's Exhibit 4, he had written in his report his belief that Ky.N. had likely taken the video, and he admitted that he could hear her voice on the recording. He also testified that the part of the file path of the video on the computer was "user\[Ky.N]\pictures", and that he could not say with certainty who the iPhone 5s that recorded the video belonged to. In regard to People's Exhibit 6, he testified that the file path for the photograph was "mybook\mypictures\2002\familygetaways" and the photo's filename included the words "Drury Inn." He also stated that he did not know who took the photographs. In regard to People's Exhibits 7 through 12, he testified that the file path of the photographs was "mypictures\2006-needssorted" and that the photos appeared to him as if the children were creating tails out of the toilet paper and appeared to be having fun. Next, Detective Matthews testified that he could not say when, if ever, any of the pictures were opened by either defendant. He also stated that he did not see any attempt to hide, obscure, or otherwise protect the photographs.

¶ 12    On redirect examination, Detective Matthews testified that he made exact copies of the data and reviewed those. He also testified that in People's Exhibit 4, he could hear the voices of both the defendant and Ky.N. Following redirect examination, the court then admitted all of the People's Exhibits, including Exhibit 14 that the defense had objected to.

5

¶ 13    The State then rested its case, and the defendant made a motion for a directed judgment of acquittal. The court then heard arguments on the motion, during which the defendant stressed the lack of knowledge of the possession. The court subsequently denied the motion, and, following an extended recess, defense counsel gave its opening remarks then proceeded to call Ky.N. to testify.

¶ 14    Ky.N. testified that she was voluntarily testifying, and that she had always felt safe and felt that her mother was supportive growing up. She testified that the family's digital cameras were usually placed where anyone could access or use them, that she had used her mother's phone to take pictures whenever she had wanted to, even daily, and that her sister had done the same. She also testified that her mother took photos of her and her sister all the time. Additionally, Ky.N. testified that her parents never asked her to take her clothes off before taking photographs or videos of her, and that they had never asked her to pose in a sexually suggestive manner.

¶ 15    In regard to People's Exhibits 7 through 12, Ky.N. testified that she didn't recognize the photos but did recognize the home. She testified that she recognized her sister and herself, but she did not remember the photographs being taken or the events being depicted. She stated that it looked like they were having fun playing horses or unicorns with the toilet paper tails, and that she and her sister commonly played with toilet paper. In regard to People's Exhibit 4, she testified that she did not recognize the video, but that it was her sister Ki.N. playing with a pogo stick, and that she recognized both her and the defendant's voice. In regard to People's Exhibit 5, Ky.N. testified that she did not recognize the video, but that it was of Ki.N. and her cousin in the shower. She testified that her sister commonly sang in the shower and that, growing up, she recorded her sister singing in the shower by pointing the phone at the floor. On cross-examination, Ky.N. testified that she did not remember her parents ever taking nude photographs of her, and that she did not

6

remember anyone else ever taking nude photos of her, and further reiterated she did not know who took the photographs but that it could have been anyone.

¶ 16   Defense Counsel next called the defendant's husband, Douglas Nichols. Douglas testified that they left the children with babysitters on Tuesdays when both he and the defendant were at work. He testified that he took photos of his children all the time. He also testified that neither he nor the defendant had ever asked them to take their clothes off to take pictures, nor had they ever asked them to pose in suggestive ways. He testified that anyone could use any cameras at any time, but that he was the one who backed up all the photographs and videos from the family's devices to the computer. He testified that when backing up the cameras, he simply dumped the photographs into folders without looking at or sorting them. For the iPhones, he explained that he just plugged them in and the computer would automatically backup the photographs, but he did not delete the photographs from the phone if it was not his own. He testified that before he was charged, he had never seen any of the charged photographs, but that his children had been spontaneous, and that included doing the things seen in the charged exhibits.

¶ 17   On cross-examination, Douglas testified that he used the family digital cameras, and he also testified that he had an "iPhone 6 Max" at some point. He also testified that his daughters had never told him that anyone had taken a photo of them naked.

¶ 18   The defendant testified next. She testified that she and Douglas would occasionally leave the children with babysitters every couple of weeks to go out together, and they left them with one every Tuesday while they both worked. She testified that the behavior seen in the photos was all in line with how Ky.N. and Ki.N. used to play. She testified that she took photos with her kids daily and that she took photos of them in both posed and spontaneous moments, but she never asked them to take their clothes off before doing so, nor did she ever pose them in sexually

7

suggestive ways. She testified that she did not know technology and agreed that Douglas handled all the photo backups on the computer. She testified that before she was charged in the case, she had never seen the photos or videos that were charged in the case. She testified that she would take photos and videos until her device was full, then give them to Douglas, who would backup the device, and then she would delete all the photos and videos from her device. She also testified that she never went back and reviewed any of the photos or videos she took. Her attorney then went through the charged photos and videos with her one by one, except for People's Exhibit 4, and she stated that she did not recall taking any of them.

¶ 19    On cross-examination she reiterated that she never reviewed the old photos and stated she did not recall ever taking the charged images, but she admitted she had taken photos of her children while they were nude. She also admitted there were times she had recorded Ki.N. topless while she was engaged in physical activity. On redirect, her attorney asked her about People's Exhibit 4, stating that he forgot to do so on direct. She testified that she did not recall taking that video either. Following the defendant's testimony, the court recessed for the day.

¶ 20    The defense resumed its case the following day, September 27, 2024, by calling Brian Bowman, whom the State, by stipulation, agreed was a digital forensic expert. He testified that the Sony photo program used to import the photos could rename the photos in batches, in the format of "prefix" then sequential numbering without requiring individual photo naming, as in the naming of People's Exhibit 5. He also testified that the date the computer showed the files were accessed was likely from the antivirus programs scanning the files due to how quickly they were accessed. Bowman also testified that it appeared to him that the phones were backed up to the computer by dragging and dropping files from file folder to file folder rather than using a software program like iTunes. He also testified that he was unaware whether the external hard drive was backed up

8

directly from the phones or if it was first transferred to the computer, then the external hard drive. Finally, he testified that there was no internet usage consistent with child pornography cases.

¶ 21     On cross-examination, Bowman testified that dark web usage is usually associated with the distribution of child pornography, which was not an issue in this case. He also testified that there was no way to know when a file was accessed beyond when it was last accessed. Therefore, he did not know whether anyone had opened it before, or for what purpose it was opened if they had. He further acknowledged that just as there is nothing showing it was viewed by a person, there was nothing showing it was not ever viewed by a person. Bowman also testified that it was possible that if one were "really quick," the file name of People's Exhibit 5 could have been changed by a person, but that it would be difficult given how quickly all the photographs in the series were renamed. Following a brief redirect, Bowman was permitted to step down.

¶ 22     Defense counsel then called the defendant's other daughter, Ki.N. to testify. She testified that she was thankful for her parents and felt safe growing up. She testified that growing up, the family camera was typically kept in the kitchen and that everyone, including members of her extended family, and possibly even babysitters, had used it. She also testified that she used her mother's phone to take pictures daily and her sister had used it frequently as well. In regard to People's Exhibits 7 through 12, she testified that she did not recall the photographs being taken, but believed that they had come up with the idea of making and playing with toilet paper tails, and that such activity was representative of the sort of spontaneous things they would do. In regard to People's Exhibit 4, she testified that she was the girl on the pogo stick and that it was not uncommon for her to take off her shirt when she got hot as a kid. She also testified that she recognized defendant's voice, as well as her sister's voice in the video, but did not remember which one took the video. In regard to People's Exhibit 5, she testified that the girls in the shower were

9

herself and her cousin, and that they were having fun showering and singing "Bop to the Top." She also testified that she did not know who took the video. Finally, Ki.N. testified that her parents had never asked her to take her clothes off for a photo or video, nor had they ever asked her to pose in a sexually suggestive manner.

¶ 23 On cross-examination, she testified that she did not specifically remember if she took her top off in People's Exhibit 4 because she was hot, nor did she remember who took People's Exhibit 5, despite her claim on direct examination that she could see anyone who came in the bathroom due to its layout. She also testified that she didn't believe People's 7 through 12 were posed as she believed they were spontaneous. Following a brief redirect, the defense rested. Following the close of evidence, the parties both presented their closing arguments. The court then took the case under advisement, stating that it would make a ruling from the bench at the next court date.

¶ 24 On October 3, 2024, the court issued its ruling from the bench. The court began by going through each of the charged images and finding that each image was lewd and therefore constituted child pornography. The trial court also found that there was constructive possession of the charged images by the defendant, and the court found her guilty on all of the possession of child pornography counts (I, IV, XI, XII, XIII, XIV, XV, XVI, XVII, and XVIII). Additionally, the trial court found that while the defendant was not guilty of permitting the manufacture of child pornography (Count II), she was guilty of actually manufacturing child pornography (Count III).

¶ 25 On October 24, 2024, the defendant requested additional time to file her post-trial motion as the transcripts of the trial were not yet available. On November 19, 2024, the defendant filed her post-trial motion, and it was heard and denied on November 21st, 2024. On December 13, 2024, a special prosecutor was appointed in the case due to a new conflict of interest that had arisen in the State's Attorney's office. On February 19, 2025, the defendant filed a motion for relief from

10

judgment as to Count III, alleging that newly discovered "material, noncumulative" evidence "of conclusive character" directly contradicted the finding that the defendant had manufactured People's Exhibit 4. On April 4, 2025, the defendant's trial counsel also withdrew due to a conflict of interest, and a new counsel of record appeared in the case to represent the defendant. On May 27, 2025, the defendant's post-trial counsel filed a motion to set aside her conviction or for a new trial based on ineffective assistance of her trial counsel.

¶ 26     On May 29, 2025, the defendant's sentencing hearing was held. It started with a discussion of the defendant's withdrawal of her February 19, 2025, motion for relief from judgment, and the decision to pursue the May 27, 2025, motion to set aside conviction, which, over a defense objection, was set for a later date. The State declined to offer evidence in aggravation, and the court then heard the evidence in mitigation. Following that, the State presented its sentencing argument and asked the court for a sentence of ten years, comprised of 7 years on Count III to run consecutively to 3 years on all other counts, which would run concurrently. The State also asked for 3 years of mandatory supervised release and a 10-year sex offender registration period. The defense then argued mitigation and asked the court for a stay of sentence. Following the defense's argument, the defendant gave a statement in allocution.

¶ 27     The court then sentenced the defendant on Count III to 6 years in the Illinois Department of Corrections, with 3 years to natural life of mandatory supervised release, a $2000 fine, and a requirement to register as a sex offender for life. Count I was then merged with Count III as a lesser included offense. For the remaining counts, she was sentenced to 24 months of conditional discharge, to run concurrently with each other, but consecutive to the sentence imposed in Count III. She was also ordered to pay fines of $1,000 per count and was ordered to register as a sex offender for life. Finally, she was ordered to submit to DNA indexing and its associated fees.

11

Immediately following the imposition of the sentence, the defense filed a motion to stay the execution of the sentence pending appeal. The motion was denied, and the sentence was entered over the defense's objection.

¶ 28 On July 8, 2025, the trial court heard the defendant's May 27, 2025, motion to set aside the conviction or, in the alternative, for a new trial based upon ineffective assistance of trial counsel. After hearing the evidence and the argument, the court denied the defendant's motion. The court then admonished the defendant as to her appeal rights. On July 15, 2025, the defendant filed her notice of appeal in this court.

¶ 29                                    II. ANALYSIS

¶ 30 On appeal, the defendant argues that: (1) the State failed to prove defendant manufactured People's Exhibit 4 beyond a reasonable doubt; (2) the charged images were not lewd as a matter of law and therefore could not constitute child pornography; (3) the State failed to prove defendant knowingly possessed child pornography beyond a reasonable doubt; (4) her trial counsel provided ineffective assistance by failing to adequately investigate evidence related to the charges against her; and (5) the statute under which she was convicted was unconstitutionally vague as applied.

¶ 31             A. The Charged Images Were Not Lewd as a Matter of Law

¶ 32 In evaluating defendant's claims on appeal, we find that defendant's second argument raised is dispositive of the appeal, and therefore, we will begin with our analysis with that claim. In regard to this claim of error, the defendant argues that the trial court conflated nudity with lewdness, finding that they were one and the same. She contends that although they contain partial or full nudity of the minor females, none of the charged exhibits constitutes child pornography because they are not lewd exhibitions as they lack the required sexual content, activity, or paraphernalia to be considered lewd to an objective person. The State, meanwhile, argues that the

12

images are lewd because there were more factors met in each photo than just nudity. The State contends that not every "lewdness factor" is required to be present for an image to be found lewd, and that in this case, each of the charged photographs and videos include enough of the factors to be considered lewd.

¶ 33    In cases such as this, the reviewing court must first determine whether a particular image is lewd for the purpose of the child pornography statute. *Lamborn*, 185 Ill. 2d. at 590. Where the image in question is available for the reviewing court to consider firsthand, the standard of review is *de novo*. *Lamborn*, 590. No deference is given to the trial court's decision, as the trial court is in no better position to judge the content of the image than the reviewing court, as the question on appeal is the application of law to undisputed fact. *People v. Sven*, 365 Ill. App. 3d 226, 231 (2006). Because of the nature of the offense involved and the harm it causes to children, child pornography is a category of material that is not protected by the First Amendment. *Lamborn*, 588-590. In determining whether a particular image involves a lewd exhibition of a child's genitals for the purpose of the child pornography statute, Illinois courts primarily consider the six factors set out by the Illinois Supreme Court in Lamborn. *Lamborn*, 185 Ill. 2d at 592.

¶ 34    The first *Lamborn* factor is whether the focal point of the image is on the child's genitals. *Lamborn*, 185 Ill. 2d at 592. In evaluating this factor, Illinois courts have held that where the photograph showed almost all of the child's body and was not zoomed in, it was not focused on the child's genitals. *People v. Lewis*, 305 Ill. App. 3d 665 (1999). However, even where it is not zoomed in, where the focal point is nonetheless on the child's genitals despite showing most of the child, this factor can support a finding of lewdness. *People v. Knebel*, 407 Ill. App. 3d 1058, 1059 (2011).

13

¶ 35    The second *Lamborn* factor is whether the setting of the image is sexually suggestive. *Lamborn*, 185 Ill. 2d at 592. In evaluating this factor, Illinois courts have held that while some rooms or places, such as a bedroom or a bathroom, may be sexually suggestive in certain circumstances, there must be more than just the presence in a particular room or place to establish a sexual setting. See *Sven*, 365 Ill. App. 3d. at 232 (a bathroom was not a sexual setting merely because it was a place that may be generally associated with sexual activity); *People v. Barger*, 2020 IL App. 3d 160316 ¶14 (a beach was not a sexual setting merely because there have been sex scenes that have occurred on beaches in television or movies); See also *Lewis*, 305 Ill. App. 3d at 678 (where a girl was standing in a bedroom with a made-up bed, the court found neither the bedroom nor the bed was a setting that suggested sexual activity); but see *Knebel*, 407 Ill. App. 3d. at 1060. (where a girl was reclining on a bed in a pose generally associated with sexual activity, the court found the setting would support a finding of lewdness regardless of whether it was a bed, daybed, mattress, or couch cushion).

¶ 36    The third *Lamborn* factor is whether the child is depicted in an unnatural pose or in inappropriate attire, considering the age of the child. *Lamborn*, 185 Ill. 2d at 592. In evaluating this factor, Illinois courts have held that, in regard to the child's pose, we look to whether the activity or pose is a natural one for the child. *Barger*, 2020 IL App. 3d at ¶15. Further, where the child is not posed, but rather where a photograph captures an uninhibited moment of adolescent spontaneity, it weighs against a finding of lewdness. *Lamborn*, 185 Ill. 2d at 592 (citing *People v. Johnson*, 186 Ill. App. 3d 116, 121-22 (1989)). As to the attire of the child, we note that nudity itself is not to be considered under this factor, as it is part of the fourth factor. *Barger*, 2020 IL App. 3d at ¶ 15. However, we note that courts have considered the appropriateness of that nudity under this factor. See *Sven*, 365 Ill. App. 3d at 232-33 (nudity was appropriate for bathing).

14

¶ 37    The fourth *Lamborn* factor is whether the child is fully clothed, partially clothed, or nude. *Lamborn*, 185 Ill. 2d at 592. The application of this factor is usually straightforward. See *People v. Wayman*, 379 Ill. App. 3d 1043, 1057 (2008) ("[the minor] was nude, which satisfies this criterion"); *Barger*, 2020 IL App. 3d 160316 at ¶12 (the child was completely naked).

¶ 38    The fifth *Lamborn* factor is whether the image suggests sexual coyness or a willingness to engage in sexual activity. *Lamborn*, 185 Ill. 2d at 592. In evaluating this factor, Illinois courts have held that for this factor to be satisfied, there should be evidence, such as gestures, facial expressions, or pose, that would suggest the subject of the photograph displayed a willingness to engage in sexual activity. *Wayman*, 379 Ill. App. 3d at 1057.

¶ 39    Finally, the sixth *Lamborn* factor is whether the image is intended or designed to elicit a sexual response in the viewer. *Lamborn*, 185 Ill. 2d at 592. In evaluating this factor, Illinois courts have held that the inquiry here is whether the image invites the viewer to perceive the image from some sexualized or deviant point of view, such as that of a voyeur. *Sven*, 365 Ill. App. 3d at 238-39. (We note that Black's Law Dictionary defines voyeur as "Someone who observes something without participating [especially someone] who gains pleasure by secretly observing another's genitals or sexual acts." Black's Law Dictionary (12th Ed. 2024), voyeur.)

¶ 40    Not all of the above six factors need to be present for an image to be deemed lewd. *Lamborn*, 185 Ill. 2d at 592. Rather, the determination of whether an image is lewd involves an analysis of the image's overall content, taking into account the age of the minor. *Lamborn*, 185 Ill. 2d at 592-93. The determination must be made on a case-by-case basis, using an objective standard. *Lamborn*, 185 Ill. 2d at 593-94. Because an objective standard is applied, the court must focus on the content of the photograph itself—and not on the conduct of the defendant—and may not

15

consider the circumstances surrounding the taking of the photograph. *Lamborn*, 185 Ill. 2d 594-95.

¶ 41    Having outlined the applicable standards for our analysis, we turn now to examine each of the charged photographs and videos in turn. Because, as noted above, we cannot consider the context in our analysis, we will begin each analysis with a description of what is objectively seen in the video, followed by an application of the *Lamborn* factors to that video.

¶ 42                              1. *People's Exhibit 4 (Counts I & III)*

¶ 43    People's Exhibit 4 is a 17-second-long video of a partially nude adolescent female with partially developed breasts fully exposed. The video is filmed by a separate individual and appears to be taking place in a finished basement living room type area due to the placement of the window on the roofline of the wall and the presence of couches and a large television in the room,. As the video begins, the female's entire body is visible in the frame, and she is only wearing underwear, socks, and slippers, with no other clothing. She is holding the pogo stick handles in her hands, with one foot on the pogo stick and one foot on the floor. The female appears to know she is being recorded because she looks straight ahead, then at the camera, then back straight ahead. As the female begins jumping on the pogo stick, the video zooms in on her clothed pubic area, and then moves upwards, focusing on her head and unclothed torso, though much of her legs and arms remain visible as well. The female then falls off the pogo stick and out of frame. As the female steps back into frame, the video zooms out to show her whole body again, and she returns to her starting position. The video then ends.

¶ 44    Turning to the first factor, the focal point of the video, we note that the video begins with the female visible "head-to-toe"; but once she begins bouncing it does zoom in on the area of her clothed genitals, then moves upward to focus on her head and unclothed torso until she quickly

16

falls out of frame and it zooms back out to capture her whole body. The zooming appears somewhat clumsy. Taken as a whole, we find that this factor weighs in favor of finding that the video was lewd.

¶ 45    Turning to the second factor, the setting of the video appears to be a basement living room. There is nothing in the setting that would suggest or invite sexual activity. Therefore, we find that the video's setting does not weigh in favor of finding it lewd.

¶ 46    Turning to the third factor, the adolescent female in the video is playing with a pogo stick, which is an age-appropriate activity. While she knows she is being recorded, she does not appear posed but instead appears to be actively playing in a moment of adolescent spontaneity. While the toplessness is inappropriate for the activity, we find it a minor factor here, as we note that we do not consider the nudity itself under this factor. Therefore, taken as a whole, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 47    Turning to the fourth factor, we note that the adolescent female in this video appears partially clothed, wearing underwear on her genitals but not wearing any top. While the nudity is partial, we do find that this factor weighs in favor of finding that the video was lewd.

¶ 48    Turning to the fifth factor, we note that there does not appear to be anything, including gestures, facial expressions, or the posing of the adolescent female, to suggest sexual coyness or willingness to engage in sexual activity. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 49    Turning to the sixth and final factor, we note that the video does not appear to suggest an intention to elicit a sexual response in an objective viewer. Neither does the video appear to invite the viewer to perceive the images from a sexualized or deviant point of view, such as that of a

17

voyeur, as the adolescent female appears to know she is being recorded. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 50　In evaluating all of the factors together, we find that factors one and four are present while factors two, three, five, and six are not. While not all factors need to be present to support a finding that a video is lewd, we find that, taking into account the overall content of the image and the age of the minor, the video shows an adolescent engaged in nonsexual conduct that is not inappropriate for her age. While we find the video deplorable, it does not meet the standard required to deem it objectively lewd. Accordingly, we find that it does not constitute child pornography under Illinois law. Therefore, the defendant's convictions and sentences on Count I and Count III are hereby reversed and vacated.

¶ 51　　　　　　　　　　　2. *People's Exhibit 5 (Count IV)*

¶ 52　People's Exhibit 5 is a 21-second-long video of two adolescent females in a shower with a glass door, with the condensation on the door partially obscuring them. It is being filmed by someone else, and it is unclear whether the two females know they are being recorded, though the video begins with one of them facing the camera. One or both females can be heard singing while showering. Both are fully nude. One female is facing in the direction of the camera when the video starts, and her breasts and genitals are visible. Midway through the video, she turns toward the other female and her buttocks is then pointed at the camera. The other female is standing at a 90-degree angle from the camera when the video starts, and during the video, she turns slightly to talk to the other female such that her breasts and genitals are visible.

¶ 53　Turning to the first factor, the focal point of the video, we note that the video is not zoomed in on any particular person or their body parts. Instead, the video appears to capture a large portion of the shower and both females, though it is clear the females are the subject of the video and not

18

the shower itself. It does not appear as though the genitals, partially developed breasts, or buttocks are the focal point. Therefore, we find this factor does not weigh in favor of finding that the video was lewd.

¶ 54    Turning to the second factor, the setting of the video appears to be a shower in a bathroom. While a bathroom can sometimes be sexually suggestive in certain circumstances, we note that Illinois courts have said that there must be more than just a presence in a particular room to suggest a sexual setting. Here, there does not appear to be anything in the setting suggesting it is meant to be sexual in nature. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 55    Turning to the third factor, both of the adolescent females are in the act of showering, which is an age-appropriate activity. Further, it appears to capture a moment of uninhibited adolescent spontaneity, as the females were singing while they were showering. Additionally, while nudity itself is not a factor to be considered under this factor, being nude in the shower is an ordinary and expected circumstance. In this context, the nudity is more appropriately explained by the setting and does not suggest sexual activity. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 56    Turning to the fourth factor, we note that both adolescent females in this video appear to be fully nude. Because they are nude, we find that this factor does weigh in favor of finding that the video was lewd.

¶ 57    Turning to the fifth factor, we note that there does not appear to be anything, including gestures, facial expressions, or the posing of the adolescent females, to suggest sexual coyness or a willingness to engage in sexual activity on the part of the females. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

19

¶ 58 Turning to the sixth and final factor, we note that nothing in the video suggests the intent of the video was to elicit a sexual response from the viewer. Neither does the video appear to invite the viewer to perceive the images from a sexualized or deviant point of view. While an attempt to surreptitiously record can suggest voyeuristic intent, the video here appears more like an attempt to capture a spontaneous moment of uninhibited adolescence in the form of the child singing in the shower, which they may stop doing if they knew they were being recorded. Additionally, it is not clear that they do not know they are being recorded. Therefore, we find that this factor does not weigh in favor of finding that the video was lewd.

¶ 59 In evaluating all of the factors together, we find that only factor four weighs in favor of a finding of lewdness, while the remaining factors do not. Taking into account the overall content of the video and the age of minors, we find that while the video is again deplorable, it is not lewd and does not meet the standard for child pornography under Illinois law. Therefore, the defendant's conviction and sentence on Count IV are hereby reversed and vacated.

¶ 60 3. *People's Exhibit 6 (Count XI)*

¶ 61 People's Exhibit 6 is a photo depicting a toddler female with her arms outstretched above the heads of the two infant females lying next to her on a bed. The toddler appears to be looking at the camera, while the two infants do not appear to do so. One infant is fully in frame, while the other infant is on the edge of the photo, such that her right leg is partially obscured. The toddler is fully in frame except for her shins and feet. All three are fully nude and lying in a supine position on a "made up" bed with what appears to be clothes to the sides of them. One toddler is holding a shoe. The image shows all three females' undeveloped breasts and the genitals are visible on the toddler female in the middle as well as the infant female on the left side of the image.

20

¶ 62    Turning to the first factor, we note that the focal point of the photo appears to be the female toddler between the two female infants. The photograph appears to be taken from someone standing on the floor off the (unseen) edge of the bed, which, due to the angle of that position, causes the toddler's genitals to be prominent in the image. Therefore, we find that factor one is at least somewhat applicable to this photo and, consequently, we find that this factor supports a finding that the photograph was lewd.

¶ 63    Turning to the second factor, the setting of the video appears to be a made bed. There is not much else visible in the photo to know exactly where the bed is located. While a bed can sometimes be sexually suggestive in certain circumstances, we note that Illinois courts have said that there must be more than that to suggest a sexual setting. Here, there does not appear to be anything in the setting suggesting that the setting is meant to be sexual in nature, such as the bed being messy or sexual paraphernalia being present. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 64    Turning to the third factor, the posing of the three infant females is not suggestive or unnatural. Lying on their backs is a perfectly natural position for children of their apparent age. Therefore, we find that this factor does not weigh in favor of a finding of lewdness.

¶ 65    Turning to the fourth factor, both of the infants and the toddler that appear in this photograph are fully nude. Because they are nude, we find that this factor does weigh in favor of finding that the photograph was lewd.

¶ 66    Turning to the fifth factor, we note that there does not appear to be anything, including gestures, facial expressions, or the posing of the toddler female or the infants, to suggest sexual coyness or willingness to engage in sexual activity. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

21

¶ 67    Turning to the sixth and final factor, we note that the photograph does not appear to suggest an intention to elicit a sexual response in an objective viewer. Neither does the photograph appear to invite the viewer to perceive the images from a sexualized or deviant point of view, such as that of a voyeur, as the toddler female appears to know she is being photographed. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 68    In evaluating all the factors together, we find that factors one and four are present while factors two, three, five, and six are not. While not all factors need to be present to support a finding that a photograph is lewd, we find that, taking into account the overall content of the image and the age of the minors, the photograph is not lewd. Accordingly, we find that the photograph, although deplorable, does not constitute child pornography. Therefore, the defendant's conviction and sentence on count XI are hereby reversed and vacated.

¶ 69                    4. *People's Exhibit 7 through 12 (Counts XII through XVII)*

¶ 70    People's Exhibit 7 is a photograph depicting two prepubescent females standing in front of an ottoman in what appears to be a living room. Both females are fully nude, one with her arm around the other, facing away from the camera. Both females have toilet paper wedged in between their buttocks and are bent over at the waist with their buttocks presented towards the camera.

¶ 71    People's Exhibit 8 is a photograph and is similar to People's Exhibit 7. The same two young prepubescent females are standing in front of a glass door to the outside in what appears to be a living room, as there is part of an ottoman, a small chair, and a pillow in the room. Both females are fully nude and facing away from the camera. Both females have toilet paper wedged in between their buttocks and are bent over at the waist, with their buttocks presented towards the camera.

22

¶ 72   People's Exhibit 9 is a photograph similar to People's Exhibits 7 and 8, with the photograph more closely resembling People's Exhibit 8. The same two young pubescent females are standing in front of a glass door to the outside in what appears to be a living room. Both females have toilet paper wedged in between their buttocks and are bent over at the waist even further than in People's Exhibit 8. One of the females has her hands on her knees, and the other has her hands at or near her ankles.

¶ 73   People's Exhibit 10 is a photograph that is similar to People's Exhibits 7, 8, and 9, where the same two prepubescent young females are standing in front of a glass door to the outside in what appears to be a living room. Both females are fully nude and standing with their backs arched. One female has toilet paper wedged in between her buttocks and is holding the other end of the toilet paper in her hand as if pulling on it. The other female has one hand reaching back and touching or grabbing her buttocks. Both females appear to be looking at the camera and are smiling.

¶ 74   People's Exhibit 11 is a photograph that is similar to People's Exhibits 7, 8, 9, and 10, with the photograph most closely resembling People's Exhibit 10. The same two prepubescent females are standing in front of a glass door in what appears to be a living room. Both females are fully nude and standing with their backs arched, though less arched than in People's Exhibit 10. One female still has toilet paper wedged in between her buttocks and is holding the other end of the toilet paper in her hand as if pulling on it; however, her buttocks is now angled toward the camera. The other female now has toilet paper appearing to be wedged in between her buttocks and is holding the other end of the toilet paper in her hand as if pulling on it.

¶ 75   People's Exhibit 12 is a photograph that is similar to People's Exhibits 7, 8, 9, 10, and 11, with the photograph most closely resembling People's Exhibits 10 and 11. The same two

23

prepubescent females are standing in front of a glass door in what appears to be a living room. Both females are fully nude and are bent over at the waist with one hand on their knee. One has her buttocks pointed towards the camera. Both females have toilet paper wedged between their buttocks and are holding the other end of the toilet paper in their hands as if pulling on it.

¶ 76    Turning to the first factor, we note that the focal point of this series of photographs is the two females and their buttocks with "toilet paper tails" wedged between them. It appears to this court that the tails appear to be the intended focal point, but due to their location, the photographs also center on the two females' buttocks. Because we believe the focal point is the toilet paper tails, we find this factor does not weigh in favor of finding that the photograph was lewd.

¶ 77    Turning to the second factor, we find that the setting for this series of photographs is an ordinary living room, which is not suggestive of sexual activity. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 78    Turning to the third factor, while the children in this series of photographs appear to be posing for the camera, their posing appears to emphasize the tails, and the children appear to be having fun, which suggests capturing moments of uninhibited adolescent spontaneity. Additionally, such play appears age-appropriate. As such, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 79    Turning to the fourth factor, the two female children in this series of photographs are completely nude. Therefore, we find that this factor does weigh in favor of a finding of lewdness.

¶ 80    Turning to the fifth factor, we note that there does not appear to be anything, including gestures, facial expressions, or the posing of the adolescent female, to suggest sexual coyness or willingness to engage in sexual activity. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

24

¶ 81    Turning to the sixth and final factor, we note that the photograph does not appear to suggest an intention to elicit a sexual response in an objective viewer. Neither does the photograph appear to invite the viewer to perceive the images from a sexualized or deviant point of view, such as that of a voyeur, as both children clearly appear to know they are being photographed. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 82    In evaluating all the factors together, we find that only factor four is present in this series of photographs, while the remaining factors are not. While not all factors need to be present to support a finding that a photograph is lewd, we find that, taking into account the overall content of the images and the apparent ages of the minors, the photograph is not lewd. Accordingly, we find that the photograph, although deplorable, does not constitute child pornography. Therefore, defendant's convictions and sentences on Counts XII, XIII, XIV, XV, XVI, and XVII are hereby reversed and vacated.

¶ 83                              5. *People's Exhibit 13*

¶ 84    People's Exhibit 13 is a photograph of two adolescent females in a shower, and it appears that the photo may have been taken at the same time as People's Exhibit 5. Both females are fully nude and appear in the act of showering. One female is facing away from the camera, and her buttocks is clearly visible. The other female is facing more towards the camera, and her breasts are visible, though obscured by the condensation on the shower door. The females appear to be having a conversation with each other and do not appear to know or be concerned about the photograph being taken.

¶ 85    Turning to the first factor, the focal point of the photograph, we note that the photograph is not zoomed in on any particular person or their body parts. Instead, the photograph appears to capture a large portion of the shower and both females, though it is clear the females are the subject

25

of the photograph and not the shower itself. It does not appear as though the genitals, partially developed breasts, or buttocks are the focal point. Therefore, we find this factor does not weigh in favor of finding that the photograph was lewd.

¶ 86    Turning to the second factor, the setting of the photograph appears to be a shower in a bathroom. While a bathroom can sometimes be sexually suggestive in certain circumstances, we note that Illinois courts have said that there must be more than just a presence in a particular room to suggest a sexual setting. Here, there does not appear to be anything in the setting suggesting it is meant to be sexual in nature. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 87    Turning to the third factor, both adolescent females appear to be in the act of showering, which is an age-appropriate activity. Additionally, while nudity itself is not a factor to be considered under this factor, being nude while in the shower is normally how one takes a shower, and thus the nudity is more appropriate than in other possible circumstances and does not suggest sexual activity. Therefore, we find that this factor does not weigh in favor of a finding of lewdness.

¶ 88    Turning to the fourth factor, we note that both adolescent females in this video appear to be fully nude. Because they are nude, we find that this factor does weigh in favor of finding that the photograph was lewd.

¶ 89    Turning to the fifth factor, we note that there does not appear to be anything, including gestures, facial expressions, or the posing of the adolescent females to suggest sexual coyness or a willingness to engage in sexual activity on the part of the females. Therefore, we find that this factor does not weigh in favor of finding that the photograph was lewd.

¶ 90    Turning to the sixth and final factor, we note that nothing in the photograph suggests the intent of the video was to elicit a sexual response from the viewer. However, the photograph here

26

does somewhat appear to invite the viewer to perceive the images from a sexualized or deviant point of view. While an attempt to surreptitiously record can suggest voyeuristic intent, we note that the photograph here appears more like an effort to capture a spontaneous moment of uninhibited adolescence, namely the two girls showering together. Therefore, we find that this factor could go either way.

¶ 91    In evaluating all of the factors together, we find that only factor four weighs strongly in favor of a finding of lewdness, while factors one, two, three, and five do not. Meanwhile, factor six seems like it could go either way. Taking into account the overall content of the photograph and age of minors, we find that while the photograph is deplorable, it is not lewd and does not meet the standard for child pornography under Illinois law. Therefore, the defendant's conviction and sentence on Count XVIII are hereby reversed and vacated.

¶ 92              B. The State Failed to Meet its Burden of Proof on Count III

¶ 93    Because we found that the defendant's second argument on appeal completely resolves this appeal, we are not required to address the defendant's other contentions of error on appeal. *Barger*, 2020 IL App. 3d 160316 ¶18. However, in the case before us, we want to briefly address the defendant's sufficiency of the evidence claim as it relates to her manufacturing charge, because the State failed to meet its burden, and we believe it is important to discuss why.

¶ 94    On appeal, the defendant claims that the trial court's decision to find her guilty was not supported by the evidence, and that she had been required to prove her innocence instead of the State being required to prove her guilt. The State argues that it met its burden to prove the defendant's guilt, and that her post-trial attempts to prove her innocence via new evidence do not negate the State's showing of guilt at trial.

¶ 95    To sustain a conviction for the offense of manufacturing child pornography, the State needed to prove that (1) the defendant filmed, videotaped, photographed, or otherwise depicted or portrayed by means of any similar visual medium or reproduction or depicts by computer (2) any child whom he or she knows or reasonably should know to be under the age of 18 where such child is (3) depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed or transparently clothed genitals, pubic area, buttocks, or, if such person is female, a fully or partially developed breast of the child. 720 ILCS 5/11-20.1(a)(1) (West 2020).

¶ 96    When evaluating a defendant's claim that there was insufficient evidence to sustain her conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Saxon*, 374 Ill. App. 3d 409, 416. We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Saxon*, 374 Ill. App. 3d 409, 416. Circumstantial evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 97    There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Saxon*, 374 Ill. App. 3d at 416-17. We do not retry the defendant; instead, we leave it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence,

28

and draw reasonable inferences based on all the evidence properly before the trier of fact. *Saxon*, 374 Ill. App. 3d 409, 416.

¶ 98 Even viewing the evidence in the light most favorable to the State, we conclude the evidence was insufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. During the State's case, the State's only witness did not testify on direct examination as to who he believed to be the one who took the video. Instead, he testified only that he believed that the defendant and Ky.N. were both using the phone around the time of the recording based on the other photographs on the device, and that, based on the voices in the video, he believed both were present when the video was recorded. However, on cross-examination, he admitted that in his report, he did indicate he believed that Ky.N. was likely the individual who took the video. Additionally, in the video itself, there is no identification of the party taking it, and its file path on the computer included Ky.N.'s name. This evidence would be insufficient to prove the defendant guilty and would, in fact, tend to prove the opposite. Unsurprisingly, then, the court does not reference this evidence in its ruling from the bench when it found the defendant guilty, instead relying on evidence presented during the defendant's case-in-chief.

¶ 99 However, even considering the evidence presented during the defendant's case-in-chief that the trial court relied on in its order, the evidence is still insufficient. During the defendant's case-in-chief, there was testimony that the defendant had recorded Ki.N. topless before, and that the defendant did not recall taking People's Exhibit 4. Additionally, Ky.N. testified that she had recorded Ki.N. singing in the shower, but that she had pointed the camera at the floor when doing so. Ki.N. did not testify as to whether she recalled who took the video or who she believed took it, only that she did not recognize it. This evidence, especially when combined with the evidence

29

presented in the State's case-in-chief, is insufficient to prove beyond a reasonable doubt which person filmed People's Exhibit 4.

¶ 100   Taken together, the circumstantial, digital, and testimonial evidence did not establish beyond a reasonable doubt that the defendant manufactured the video charged in Count III. Accordingly, the evidence was insufficient to support the conviction, and therefore, we would also reverse and vacate the defendant's conviction and sentence on Count III on the grounds of insufficient evidence in addition to the grounds that it was not lewd as a matter of law.

¶ 101                                III. CONCLUSION

¶ 102   Although we believe that the photographs and videos in this case are deplorable, we must find that, as a matter of law, they are not lewd nor do they constitute child pornography as defined by Illinois statute. Neither can we say that the State met its burden of proof on Count III. Therefore, the judgments of guilty and the corresponding sentences imposed by the circuit court of Macon County in this case are reversed and vacated, the matters are dismissed, and the defendant is ordered to be discharged. Based on our ruling and the circumstances of this case, we order that our judgment and the corresponding mandate be issued immediately.

¶ 103   Reversed, dismissed, and defendant discharged.